[Crim. No. 10030. First Dist., Div. One. Apr. 11, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD WILSON ORSER, Defendant and Appellant.

[Crim. No. 10318. First Dist., Div. One. Apr. 11, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
ROWENA GURNER et al., Defendants and Appellants.

(Consolidated Appeals.)

**COUNSEL**

Paul N. Halvonik and Charles C. Marson for Defendants and Appellants.

Evelle J. Younger, Attorney General, Herbert F. Ashby and Edward A. Hinz, Jr., Chief Assistant Attorneys General, William E. James, Assistant Attorney General, Joyce F. Nedde, Herbert F. Wilkinson, Derald E. Granberg and Charles R. B. Kirk, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MOLINARI, P. J.**—The appeals in these cases have been consolidated since they involve the same issues. In each, defendants were convicted of violating section 601 of the Business and Professions Code,[1] and on appeal they contend that this statute is unconstitutional.

At the time of the proceedings below, section 601 provided as follows: "Every person who willfully writes, composes or publishes any notice or advertisement of any medicine or means for producing or facilitating a miscarriage or abortion, or for the prevention of conception, or who offers his services by any notice, advertisement, or otherwise, to assist in the accomplishment of any such purpose is guilty of a felony and shall be punished as provided in the Penal Code. It shall not, however, be unlawful for information about the prevention of conception to be disseminated for purposes of public health education by any person who is not commercially interested, directly or indirectly, in the sale of any medicine or means which may be used for the prevention of conception."[2]

On January 16, 1969, the following item appeared in the Mid-Peninsula Free University bulletin: *"Anyone* needing a competent physician to terminate an unwanted pregnancy (inexpensively) or other birth control aid, call 323-6802 between 10 and 11 p.m. Call also if you are interested in legalizing abortion or in counseling those seeking abortions." Sharon Schauer, a stenographer in the sheriff's office, responded to the advertisement and indicated to a male who responded to her telephone call that she was a Mrs. Schauer and that she needed an abortion. She was told to obtain a pregnancy test and to call back prior to the following Tuesday when he would be having a clinic. He told her not to be concerned, that they would be able to help her get either a legal or an illegal abortion. Several days later Deputy Sheriff Barbara Schrier placed a call to the number set forth in the bulletin, and when a male voice answered, told him that a prior call had been made, that she had verified her pregnancy, and that she would like to make arrangements for counseling. She was

---

[1]Unless otherwise indicated, all statutory references are to the Business and Professions Code.

[2]The statute was amended in 1971, and it currently reads as follows: "Every person who willfully writes, composes or publishes any notice or advertisement of any medicine or means for producing or facilitating a miscarriage or abortion, or who offers his services by any notice, advertisement, or otherwise, to assist in the accomplishment of any such purpose is guilty of a felony and shall be punished as provided in the Penal Code." (Stats. 1971, ch. 652, § 1.)

told that there would be a clinic meeting a few days later at 2212 Clarke Avenue, East Palo Alto, at 8 p.m.

Deputy Schrier went to the residence on Clarke Avenue at the appointed time where she met defendant Orser. Other women were present. Orser identified himself as Conrad Alexof and invited the group of women into the living room. There he asked the women to fill out certain information on cards furnished by him and then proceeded to describe three methods by which an abortion could be obtained: legal therapeutic abortion, self-induced abortions through digital manipulations, and abortions performed in Mexico. Orser described what was necessary to obtain a therapeutic abortion and stated he could make arrangements for Mexican abortions.

Orser indicated that each woman would have to decide for herself whether she wanted to have an abortion and, if so, the procedure she wanted to use. Orser asked Deputy Schrier if she wanted to go to Mexico and she told him she would let him know in a few days. When Orser telephoned her a few days later to inquire if she was interested in a Mexican abortion, as he was in the process of making arrangements for an abortion for another woman in Nogales, Schrier told him she wanted a private consultation so that Orser could explain the procedure and charges to her boy friend. Orser told her there would be a $20 charge for a private consultation.

Two days later Schrier went to the Clarke Avenue residence with Detective Sergeant Richard McKillip. Orser explained to the couple the three alternative methods of obtaining an abortion. He told the couple what the doctor's fee for a Mexican abortion would be and described the travel arrangements. Schrier and McKillip indicated they preferred a Mexican abortion and stated they would call back later that evening to find out if Orser had made the necessary arrangements. Orser was paid $20 for the consultation. When the couple called back Orser told them the necessary arrangements had been made. He explained the procedure to Schrier and asked her to contact him after she returned. Orser was arrested on the same evening.

With respect to defendants Maginnis and Gurner, the record discloses that on February 20, 1967, Lieutenant Cardoza of the San Mateo County Sheriff's office attended a meeting at a residence in Redwood City; approximately 20 persons ranging from 17 to 40 years of age, and of both sexes, were present; and that Maginnis and Gurner gave a lecture on self-induced abortions and distributed a pamphlet which described a means for producing and facilitating an abortion. The pamphlet was

basically an instruction sheet on the digital method of inducing an abortion and described the digital technique by either of two methods. These instructions contained a warning concerning the dangers of this method and included a statement as to possible criminal liability.

The only reported decision dealing with section 601 is *People* v. *McKean* (1925) 76 Cal.App. 114 [243 P. 898].[3] In that case the reviewing court was not called upon to pass on the constitutionality of the statute but to interpret its meaning. The appellate court pointed out that the statute as a whole is aimed against advertisements of the means for producing miscarriages or abortions or for preventing conception, and that it proscribes two types of conduct: (1) it is directed against the writing, composition, or publication of such notices, advertisements as are designed to bring home to the public a knowledge of certain medicines or means to bring about an abortion or a miscarriage or to prevent conception; and (2) it is directed against the offering of a person's services to assist in the accomplishment of any miscarriage or abortion or the prevention of conception by an advertisement. (At pp. 117-118.)

*McKean* observes that "The idea underlying the word 'advertisement' has reference not so much to the vehicle or instrumentality used for getting the notice before the public, as to the diffusion, or bringing home to the public, of the information or matter contained in the notice. [Citation.]," and interprets the words "notice" and "advertisement" to mean written, printed, or pictorial matter. (76 Cal.App. at p. 118.) Accordingly, these terms include announcements in periodicals, handbills, placards, notices sent through the mail and circulars left upon doorsteps. (76 Cal.App. at p. 118.) ▮ With particular reference to the phrase "or otherwise" which appears in the clause of the statute relating to an offer of services to assist in the accomplishment of a miscarriage, an abortion or the prevention of conception, i.e., "by any notice, advertisement, or otherwise," *McKean* concluded that it "should be construed as signifying other like means, i.e., means which are of the same general nature or class as advertisements, or which are of the same general nature or class as those notices which are akin to advertisements." (76 Cal.App. at p. 118.)[4]

---

[3]A petition for a hearing by the Supreme Court was not filed.

[4]The interpretation made in *McKean* gives effect to the intent of the Legislature. Such intent may be ascertained not only from a literal meaning of the words of the statute but upon a consideration of all the law relating to the same subject matter. (*People* v. *Hallner,* 43 Cal.2d 715, 719 [277 P.2d 393].) "Where a statute has been construed by judicial decision, and that construction is not altered by subsequent legislation, it must be presumed that the Legislature is aware of the judicial construction and approves of it. [Citations.]" (*People* v. *Hallner, supra,* 43 Cal.2d at p. 719; *People* v. *Courtney,* 176 Cal.App.2d 731, 741 [1 Cal.Rptr. 789].) This rule is

In the light of the interpretation made in *McKean,* the oral statements made by defendants in the instant case are not within the proscription of section 601. However, the item printed in the Mid-Peninsula Free University bulletin and the pamphlet describing means for producing and facilitating an abortion distributed by defendants Maginnis and Gurner do come within the proscription of the statute. Accordingly, in the absence of constitutional infirmities there was sufficient evidence to connect defendant Orser with the item in the bulletin and defendants Maginnis and Gurner with the pamphlet to sustain convictions for violating section 601.

Defendants contend that section 601 is unconstitutional in that it infringes on the freedom of expression protected by the First Amendment and denies them the equal protection of the laws.

■ The First Amendment freedom of speech and press are protected by the due process clause of the Fourteenth Amendment from invasion by state action. (*Lovell* v. *Griffin,* 303 U.S. 444, 450 [82 L.Ed. 949, 952-953, 58 S.Ct. 666]; *Smith* v. *California,* 361 U.S. 147, 149-150 [4 L.Ed.2d 205, 208-209, 80 S.Ct. 399]; *Weaver* v. *Jordan,* 64 Cal.2d 235, 241 [49 Cal.Rptr. 537, 411 P.2d 289] [cert. den. 385 U.S. 844 (17 L.Ed. 2d 75, 87 S.Ct. 49)]. The guaranty extends to both the content of the communication and the means employed for its dissemination, and the right includes not only the right to utter and print but the right to distribute, the right to receive and the right to read. (*Weaver* v. *Jordan, supra,* at pp. 241-242.) ■ These rights have such a paramount and preferred place in our democratic system that any system of prior restraints of expression come before the courts " 'bearing a heavy presumption against its constitutional validity.' " (*Freedman* v. *Maryland,* 380 U.S. 51, 57-58 [13 L.Ed. 2d 649, 654, 85 S.Ct. 734]; *Thomas* v. *Collins,* 323 U.S. 516, 529-530 [89 L.Ed. 430, 439-440, 65 S.Ct. 315]; *Weaver* v. *Jordan, supra.*) Accordingly, any attempt to restrict those liberties must be justified by a clear public interest threatened by a clear and present danger, i.e., a danger that

not rendered inapplicable by the fact that the determinative decision is rendered by a Court of Appeal. (See *People* v. *Hallner, supra,* at pp. 717-718; *People* v. *Courtney, supra,* at p. 740.) *McKean* was decided in 1925. At that time the statutory proscription was set forth in section 317 of the Penal Code. In 1937 the Legislature enacted section 601 which was based, without any material change, on former Penal Code section 317. The Legislature amended section 601 in 1965 and again in 1971. Neither of these amendments disturbed the language dealing with notice or advertisement, nor was any change made in the phrase "who offers his services by any notice, advertisement, or otherwise, . . ." The omission of any legislative action in these particulars within the past 37 years warrants the presumption that the Legislature approves the interpretation made by *McKean*. This inaction is particularly significant in light of the fact that the Legislature has on two occasions chosen to amend other portions of the statute.

will bring about a substantive evil that the legislative authority has a right to correct. (*Thomas* v. *Collins, supra,* at p. 530 [89 L.Ed. at p. 440]; *Katzev* v. *County of Los Angeles,* 52 Cal.2d 360, 366 [341 P.2d 310]; *Weaver* v. *Jordan, supra,* at p. 243.)

■ We here observe that the rights of freedom of speech and freedom of the press are not removed from the protection of the First Amendment because they are transmitted in a commercial setting or for profit. A person is as much entitled to the protection of the First Amendment when the speech he utters or prints is for profit as when it is expressed altruistically. (See *Thomas* v. *Collins, supra,* 323 U.S. 516, 531 [89 L.Ed. 430, 440-441]; *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 266 [11 L.Ed.2d 686, 698, 84 S.Ct. 710, 95 A.L.R.2d 1412]; *Wirta* v. *Alameda-Contra Costa Transit Dist.,* 68 Cal.2d 51, 54, 56-57 [64 Cal.Rptr. 430, 434 P.2d 982].)

In determining whether activity is entitled to the protection of the First Amendment, it is the character of the right, not the limitation, which is determinative. (*Thomas* v. *Collins, supra,* 323 U.S. 516, 530 [89 L.Ed. 430, 440].) In *People* v. *Belous,* 71 Cal.2d 954, 963 [80 Cal.Rptr. 354, 458 P.2d 194] [cert. den. 397 U.S. 915 (25 L.Ed.2d 96, 90 S.Ct. 920)], it was held that a woman has a fundamental right to choose whether to bear children; and in *People* v. *Barksdale,* 8 Cal.3d 320 [105 Cal.Rptr. 1, 503 P.2d 257], wherein certain provisions of the Therapeutic Abortion Act (Health & Saf. Code, §§ 25950-25954) were held to be valid and others invalid, it was held that a woman may submit to an abortion within 20 weeks of the time of conception provided the abortion is performed in an accredited hospital by a person holding a physician's and surgeon's certificate. (At pp. 334-338.)[5] *Barksdale* also holds that Penal Code section 274, restricting the performance of abortions except as provided by the valid portions of the Therapeutic Abortion Act, is valid in its entirety. (At p. 338.)

More recently, the United States Supreme Court has held that the right of privacy encompasses a woman's decision whether or not to terminate her pregnancy but that this right is not absolute but subject to a state's legitimate interest in safeguarding the woman's health, in maintaining proper medical standards and in protecting potential human life. (*Roe* v. *Wade,* 410 U.S. 113, 153-155, 159-162 [35 L.Ed.2d 147, 177-178, 180-

---

[5]*Barksdale* recognizes that a woman has the right to procure an abortion after the twentieth week of pregnancy where, to a medical certainty, the result of childbirth would be death because the law has always recognized that a woman's right to life takes precedence over any interest the state may have in the unborn. (8 Cal.3d at p. 335; see *People* v. *Belous, supra,* 71 Cal.2d at p. 969.)

182, 93 S.Ct. 705]; *Doe* v. *Bolton,* 410 U.S. 179, 189 [35 L.Ed.2d 201, 211, 93 S.Ct. 739].) Accordingly, it was concluded in *Wade* that prior to the end of the first trimester of pregnancy, the state may not interfere with or regulate an attending physician's decision, reached in consultation with his patient, that the patient's pregnancy should be terminated; that from and after the first trimester, and until the point in time when the fetus becomes viable, the state may regulate the abortion procedure only to the extent such regulation relates to the preservation and protection of material health; that from and after the point in time when the fetus becomes viable, the state may prohibit abortions altogether, except those necessary to preserve the life or health of the mother; and that the state may proscribe the performance of all abortions except those performed by physicians currently licensed by the state. (410 U.S. at pp. 163-164 [35 L.Ed.2d at pp. 182-183].) *Bolton* reaffirms the rationale of *Wade* but declares unconstitutional the requirement by a state that abortions be performed in accredited hospitals, that they be approved by a hospital committee and the concurrence of two other physicians, and that they be limited to the residents of the state. (410 U.S. at pp. 187-189 [35 L.Ed.2d at pp. 210-218].)

The foregoing authorities indicate that a state can declare abortions performed under certain delineated circumstances to be legal and those performed under certain other circumstances to be illegal. In California abortions performed pursuant to the Therapeutic Abortion Law as it now stands, shorn of its invalid provisions, are permitted. ▮ Section 601, however, does not distinguish between abortions which are permitted and those which are not. Its broad language encompasses activity which is legal and activity which is illegal. By its terms it proscribes the advertising or publication of information concerning the obtaining of abortions permitted by law. It makes no distinction between the dissemination of advertising which is truthful and which calls attention to the means by which a legal abortion may be obtained and the advertising which calls attention to the means of obtaining an illegal abortion.

▮ Section 601 prohibits anyone from offering in writing his services to assist in the accomplishment of an abortion. It would therefore prohibit any group which offers counseling regarding legal abortions from publishing any notice to this effect. In doing so it restricts the freedom of expression protected by the First Amendment.[6]

---

[6]We observe that in *In re Schillaci,* 196 Cal.App.2d 591, 594 [16 Cal.Rptr. 757], it was held that the publication of beneficial information about drugs or treatment is protected by the First Amendment.

The People contend that the evil which the statute seeks to prevent is the occurrence of illegal abortions. If this is so then section 601 is drawn in an overly broad manner because the statute applies not only to those who would make arrangements for illegal abortions but also those who would provide information on the availability of legal abortions. We observe here that at the time the proscriptions in the statute were first enacted abortions were permitted only to save the life of the mother. (See former Pen. Code, § 274.) The Legislature has since expanded the situations in which an abortion may be legally obtained by the enactment of the Therapeutic Abortion Act. The situations therein provided were further expanded by the decision in *Barksdale* deleting therefrom certain invalid provisions. In the light of these changes in the law it is difficult to discern how illegal abortions will be deterred by prohibiting information on the availability of legal abortions.

 It is elementary that the government may regulate First Amendment freedoms only with narrow specificity. (*N. A. A. C. P.* v. *Button,* 371 U.S. 415, 433 [9 L.Ed.2d 405, 418, 83 S.Ct. 328].) "When a statute, ordinance, or regulation 'completely prohibits protected activities although a narrower measure would fully achieve the intended ends and at the same time preserve an effective place for the dissemination of ideas' its overbreadth may render it unconstitutional. [Citations.]" (*Mandel* v. *Municipal Court,* 276 Cal.App.2d 649, 662 [81 Cal.Rptr. 173]; see *In re Hoffman,* 67 Cal.2d 845, 853 [64 Cal.Rptr. 97, 434 P.2d 353]; *N. A. A. C. P.* v. *Button, supra,* at pp. 431-438 [9 L.Ed.2d at pp. 417-421].)

In *American Civil Liberties Union* v. *Board of Education,* 59 Cal.2d 203, 220 [28 Cal.Rptr. 700, 379 P.2d 4], we find the following pertinent statement: "In the final analysis, the determination that a particular statute is or is not too broad in the constitutional sense turns not so much on its language as upon *its effect.*" (Italics added.) The effect of section 601 is not narrow and limited in its application so as to be directed to written matter dealing solely with illegal abortions but is equally applicable to written information concerning legal abortions. When a statute casts its net so broadly it is inappropriate to accept an invitation to balance the respective interests of the government and the citizen. (*United States* v. *Robel,* 389 U.S. 258, 268, fn. 20 [19 L.Ed.2d 508, 516, 88 S.Ct. 419].) Accordingly, because of its overbreadth, section 601 is unconstitutional.

In view of the conclusion reached by us, it is unnecessary to consider the contention that section 601 is unconstitutional because it deprives

defendants of the equal protection of the laws in that persons who advocate the same ideas and disseminate the same information orally are not subject to conviction under the laws of California.

The respective judgments are reversed with directions to the trial court to dismiss the respective informations.

Elkington, J., and Weinberger, J.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.